## Craig v. Beach et al.

December 10, 1946.

R. J. Wade for appellant.

William G. Reed for appellees.

OPINION OF THE COURT BY JUDGE DAWSON—Affirming.

On February 11, 1943, the appellant, plaintiff below, then about seventy-five years of age, executed a deed to a house and lot in Worthville, Carroll County, to the appellees. This property is worth between $2000.00 and $2500.00, and the consideration for the transfer was the promise on the part of grantees to provide the grantor "with a home, furnish him with necessary board, clothing, medical care, and provide for his burial at his death." Craig had been living in the Beach home several days prior to the execution of the deed, and it was his suggestion that he deed them this property in return for their agreement to care for him.

On November 26, 1943, the Beaches and Craig executed a deed to the property to a third party who immediately deeded it back to the Beaches. The purpose of these transfers was to release the lien in favor of Craig.

At the same time the Beaches, in consideration of Craig releasing his lien, executed a written contract by which they obligated themselves to provide Craig with "necessary board, clothing, medical care, and to provide burial."

The Beach family consisted of Mr. and Mrs. Beach, Mrs. Beach's mother, and a young boy the Beaches were raising. Their home had four rooms and Mr. Craig lived in the home for about nine months, being treated more or less as a member of the family. Mr. Craig was so untidy in his personal habits that the Beaches repaired and furnished a one room building which was within six feet of the kitchen door, and to which a concrete walk was laid, and Craig moved into this room. He was living in this building at the time of the transactions in November 1943.

The situation continued thus until August or September 1944, when Mr. Craig left one morning, saying to Mrs. Beach that he was going for some tobacco. He has never returned. The Beaches say they made several efforts to locate him but did not find him at his usual haunts. It appeared that he was in the habit of visiting around the neighborhood with old friends for two or three days at a time and then returning home. Craig was finally located at the Carroll County infirmary. A few months later this action to cancel the deed was instituted.

The evidence shows that Mr. Craig has been an irresponsible sort of person all his life and was of low mentality. A physician describes him as a moron. Other witnesses who had known him for years say he was just shiftless and lazy and was rather shrewd in trading.

No question is made about the adequacy of the consideration for the deed, all parties seeming to agree that it was a good arrangement at the time. Craig's life expectancy was something over eight years at the time the deed was executed. It is claimed, however, that when the November 1943, transactions took place the Beaches

took advantage of the mental condition of Craig and deprived him of rights that he had retained in the deed. The purpose of the transaction, according to the Beaches, was to free the property of a lien so that they might borrow some money with the property as collateral. Several witnesses are introduced on both sides, the preponderance of the testimony being that the Beaches furnished him a good home even after he was removed to the outside room. The Beaches explained their desire to get him out of their house because of Craig's untidy habits, such as spitting on the floor. Craig does not deny this, saying that sometimes he did and sometimes he didn't. He does not say he objected to being moved to the other building, and was living there at the time of the last transactions. His only explanation as to why he left the Beach home is that he became dissatisfied.

He claims that by the execution of the last contract the Beaches were relieved of the responsibility of providing him a home. The contract carried out all the other obligations of the deed.

The Beaches say, and it is not disputed, that they are at all times ready, willing and able to carry out their part of the agreement and that if Mr. Craig returns he will be accorded the same treatment he received in the beginning, and that his room is still available to him.

In carrying out the terms of their agreement the Beaches were under a duty to furnish Mr. Craig with kind personal treatment as well as proper food and maintenance, but, on the other hand, there was a corresponding duty on the part of Mr. Craig to respect the feelings of the Beaches and conform as nearly as possible to the habits of their household. Since his personal habits were obnoxious the Beaches arranged for a separate room for Mr. Craig which, according to the evidence, was comfortable and where he apparently was satisfied. Actually no serious complaint is made of the new arrangement.

In this kind of contracts the law does not require perfection, and a substantial compliance is sufficient. Watson v. Gilliam, 252 Ky. 762, 68 S. W. 2d 399.

When Mr. Craig left the Beach home, of his own accord, not even advising Mrs. Beach that he would not

return, it put it out of the power of the Beaches to render the service contemplated by their contract. While Mr. Craig says he was dissatisfied with the arrangements at the Beach home, he points to no specific circumstance to justify his dissatisfaction. On the other hand, the Beaches have taken the position that they have at all times been, and are still, willing and able to carry out the terms of their agreement, and if Mr. Craig desires to return he will have the same accommodations that he has had since the arrangement was entered into.

Since the present situation is not the fault of the Beaches, Mr. Craig can not now hold them responsible for it as it is one of his own making. See Elswick v. Elswick, 220 Ky. 723, 295 S. W. 1070, and Bowles' Adm'r v. Harvey, 189 Ky. 598, 225 S. W. 367.

It must be kept in mind that this is an action to set aside a deed, and the rule is that the power reposed in courts of equity to set aside deeds is an extraordinary one and should not be lightly exercised. Petrey's Adm'r v. Petrey, 262 Ky. 222, 90 S. W. 2d 4, and other cases.

After examining all of the testimony in the record we have come to the conclusion that the ruling of the chancellor is supported by ample evidence and the judgment is accordingly affirmed.